**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION**

| | | |
|---|---|---|
| **GRAND PARKWAY SURGERY CENTER, LLC** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **Civil Action No. _____** |
| | § | |
| **HEALTH CARE SERVICE CORPORATION, A** | § | |
| **MUTUAL LEGAL RESERVE COMPANY, d/b/a** | § | |
| **BLUECROSS BLUESHIELD OF ILLINOIS** | § | |
| *Defendant* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES, GRAND PARKWAY SURGERY CENTER, LLC, hereinafter referred to as Plaintiff, complaining of and about HEALTH CARE SERVICE CORPORATION, A MUTUAL LEGAL RESERVE COMPANY, d/b/a BLUECROSS BLUESHIELD OF ILLINOIS, hereinafter referred to as Defendant, and for cause of action show unto the Court the following:

### PARTIES

1.      Plaintiff, GRAND PARKWAY SURGERY CENTER, LLC, is a Texas Limited Liability Company with operations and its place of business in Fort Bend County, Texas.

2.      Defendant, HEALTH CARE SERVICE CORPORATION, A MUTUAL LEGAL RESERVE COMPANY, d/b/a BLUECROSS BLUESHIELD OF ILLINOIS, is a corporation that is incorporated under the laws of the State of Illinois and has its principal place of business in the State of Illinois. Defendant does not have a registered agent for service of process in the State of Texas. It may be served with process by serving any officer or agent of the corporation at 300 East Randolph Street, Chicago, Illinois 60601.

### JURISDICTION AND VENUE

3.      Plaintiff's claims arise in part under 29 U.S.C. §§ 1001, *et seq.*, the Employment Retirement Income Security Act ("ERISA"). Therefore, this Court has jurisdiction over those claims

under 28 U.S.C. § 1331. Furthermore, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's non-ERISA claims, as those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution. Furthermore, diversity jurisdiction exists over Plaintiff's non-ERISA claims because there is complete diversity between Plaintiff and Defendant and the amount in controversy is $75,000 or greater.

4.      This court has jurisdiction over Defendant. Defendant has purposefully availed itself to the privilege of conducting activities in the State of Texas and established minimum contacts sufficient to confer jurisdiction over said Defendant. The assumption of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

5.      Plaintiff would show that Defendant had continuous and systematic contacts with the State of Texas sufficient to establish general jurisdiction over said Defendant.

6.      Plaintiff would also show that the cause of action arose from or relates to the contact of Defendant to the State of Texas, thereby conferring specific jurisdiction with respect to said Defendant.

7.      Venue is properly established in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this suit occurred in this judicial district.

## STATEMENT OF FACTS

8.      Plaintiff is a medical provider that offers ambulatory surgical services in the fields of orthopedics, podiatry, pain management, spine, gastroenterology, and pediatric ENT. Their teams consist of seasoned professionals, including award-winning surgeons and top-performing nurses and staff.

9.      Healthcare providers, such as Plaintiff, are classified as either "in-network" medical providers or "out-of-network" medical providers.   "In-network" medical providers have pre-determined discounted rates with health insurance companies.   Conversely, "out-of-network" medical providers do not have pre-determined discounted rates with health insurance companies and are typically paid "usual and customary" rates, sometimes also referred to as a "usual, customary and reasonable" rate, for the same or similar medical service in their geographical area. Plaintiff is an out-of-network medical provider. The plan documents at issue in this case require the health insurance company to pay out-of-network providers the "Allowable Amount" under the health insurance plan. The Allowable Amount is normally the usual and customary rate.

10.      Patients pay significantly higher health insurance premiums for out-of-network health benefits in order to have access to out-of-network medical providers.   Patients pay these higher premiums for assurance and peace of mind they will be able to obtain necessary medical services from the physician, medical provider and medical facility of their choice.

11.      The American Medical Association defines "Usual, Customary and Reasonable": (a) 'usual' fee means that fee usually charged, for a given service, by an individual physician to his private patient (i.e., his own usual fee); (b) a fee is 'customary' when it is within the range of usual fees currently charged by physicians of similar training and experience, for the same service within the same specific and limited geographical area; and (c) a fee is 'reasonable' when it meets the above two criteria and is justifiable, considering the special circumstances of the particular case in question, without regard to payments that have been discounted under governmental or private plans.

12.      The United States government, on its healthcare.gov website, defines "Usual, Customary, and Reasonable" as "The amount paid for a medical service in a geographic area based

on what providers in the area usually charge for the same or similar medical service. The UCR amount sometimes is used to determine the allowed amount."

13.     The ERISA Compliance for Health & Welfare Plans defines "Usual, Customary and Reasonable" as a rate at which many Group Health Plans pay benefits, determined by factors such as the average amount charged by providers in the geographical area for the service, the amount most commonly charged by providers in the geographical area or the amount upon which Medicare or another governmental plan would base its benefits.

14.     These definitions are generally accepted throughout the medical and health insurance industries. Out of network health insurance plans, including the plans at issue in this case, typically use language substantially similar to these definitions as demonstrated below.

15.     The following plan language is representative exemplars of operative language used in the plans at issue in this case and illustrate Defendant's obligation to pay usual and customary for out of network medical services:

**Exemplar No. 1:**     A reasonable and customary charge is the usual cost for comparable treatment in a local geographic area. Charges for non-network doctors fees covered under the plan are subject to reasonable and customary reimbursement limits. The reasonable and customary reimbursement level is set at the 80th percentile of charges in a geographic area.

**Exemplar No. 2:**     The Allowable Amount will be the lesser of the billed charge or the amount BCBSTX would have considered for payment for the same covered procedure, service or supply if performed or provided by a Physician or professional Other Provider with Similar experience and/ or skill.

**Exemplar No. 3:**     The maximum amount that will be allowed by [the plan] for a medical service or supply. Allowable amount is determined by BCBSTX based on either charges made for the same service by providers in the same geographic area with similar training, experience, and facilities, or negotiated rates with providers who have contracted with BCBSTX...

Under each of these definitions, payment to the medical provider is based upon charges for the same procedure from other providers in the same geographic region with similar training and

experience. These definitions are synonymous with "usual and customary," match up with the American Medical Association and United States' government's definitions of "usual, customary, and reasonable," and are standard within the industry.

16.     Defendant acted as and/or was designated as the plan administrator for claims made against patients' Blue Cross Blue Shield health benefit plans for medical services performed at Plaintiff's surgical facility.

17.     Defendant exercised discretion, control, authority and/or oversight in the administration of these claims, including determining whether to pay and how much to pay for the medical services provided by Plaintiff.  Defendant administered each and every claim at issue in this lawsuit.

18.     The claims at issue in this lawsuit are the result of non-payment or under-payment of claims made by Plaintiff against patients' Blue Cross Blue Shield health benefit plans for medical services performed at Plaintiff's surgical facility.

19.     Plaintiff followed the same process for each and every claim in the lawsuit as described below.  This process is routine for Plaintiff's business and routine within the health care industry.

20.     Plaintiff received orders from physicians requesting the scheduling of medical services to be performed by the physician at Plaintiff's surgical facility.  The orders contained the patient's name, contact information, and identified the medical services to be performed.

21.     Plaintiff contacted the patient to obtain the patient's health insurance information including policy number.  Prior to scheduling or performing any medical services, Plaintiff called the Defendant at its designated telephone number to verify covered health benefits, including out-of-network benefits and coverage for the particular medical services to be performed. As explained

above, it is well understood within the medical field and within the healthcare insurance industry that out-of-network benefits are paid at providers' usual and customary rates. When Plaintiff obtained the verifications of benefits from Defendant, it reasonably expected that reimbursement for its services would be at the rate that medical providers have long expected to be paid.

22.     Reimbursement at usual and customary is well-known to commercial health insurance payors. It is also well-known to medical providers such as Plaintiff who rely upon the Defendant's representations and compliance with industry custom when treating patients. The custom within the industry for out-of-network providers such as Plaintiff to be paid their usual and customary rates for medical services performed is so well-established that if the rate of reimbursement were to be at any rate other the usual and customary or usual, customary and reasonable, then the Defendant, who is the only party that would have known that a rate of reimbursement was something other than the expected rate, had a duty and obligation to alert Plaintiff to this reality.

23.     Plaintiff in fact relied upon the information gathered from Defendant during this verification process, including the implied representation from Defendant that Plaintiff was to be reimbursed at the usual and customary rate for the medical services provided.

24.     Plaintiff scheduled the medical services with the patient.  Upon arrival for the procedure, each patient expressly and knowingly executed an Assignment of Benefits.  The Assignment of Benefits transferred and assigned to Plaintiff the rights and interest to collect and be reimbursed for the patient's medical service(s) performed at Plaintiff's facility, assigned rights to the provider and its attorney to obtain plan documents and other related documents and information, and assigned any legal or administrative claims and causes of action, including breach of fiduciary duty claims and other legal and/or administrative claims.

25.     After medical services were performed, Plaintiff properly and timely submitted claims through Defendant's designated claims handling channels.   Defendant either denied the claims outright or drastically underpaid the claims.

26.     After Defendant either denied or underpaid the claims, Plaintiff properly and timely appealed the non-payment and underpayment of the claims through Defendant's designated appeals channels.   Defendant denied each and every appeal for each and every claim at issue in this lawsuit thereby exhausting Plaintiff's administrative remedies. Defendant either provided no explanations for its adverse determinations against Plaintiff or provided conclusory explanations that frequently consisted of one to two sentences that read that Defendant was "maintain[ing] the prior decision" or that the "claim processed correctly."

27.     Exhibit "A", which is incorporated herein by reference, is a spreadsheet showing the non-payments and underpayments for each claim in this case.   The spreadsheet contains the claims, dates of service, policy numbers, group ID numbers, usual and customary amounts incurred and billed for services rendered, and the amounts actually paid for those services.

28.     Plaintiff billed $11,767,590.57, which is the usual and customary rate for the particular medical services in and around Fort Bend and surrounding counties. Defendant paid a mere $742,222.97, which is approximately 6.31% of the amount billed for the services rendered.

29.     Payment of 6.31% of the usual and customary rates for same or similar medical services rendered is dramatically lower than any other of the Plaintiff's commercial insurance payors, including United, Cigna, and Aetna, and is tantamount to no payment at all.

30.     Moreover, based on information and belief, payment of 6.31% of the usual and customary rates for same or similar medical services rendered is drastically lower than any other recognizable third party commercial or even government payor in the larger health care industry,

including United, Cigna, Aetna and Medicare, respectively. Significantly, patients pay higher premiums, at times substantially higher premiums, so that they may receive medical treatment from the provider of their choice, including from out of network providers. They bargain for and expect that payment be made at the providers' usual and customary rates. In Plaintiff's experience, the payment of six cents on the dollar for the rendering of medical treatment is unprecedented.

31.     Upon information and belief, Defendant acted as and/or was designated as the plan administrators and as fiduciaries to the beneficiaries for each of the claims at issue in this case. Defendant exercised discretion, authority, control and oversight in determining if plan benefits would be paid and the amounts of plan benefits that would be paid.  Defendant's administration of these claims resulted in the payment of a mere 6.31% of the usual and customary rates for medical services rendered.

32.     Plaintiff's causes of action arise out of violations of two separate categories of insurance policies: ERISA plans and private insurance plans.

33.     ERISA plans are plans in which an employer either sponsors a health plan who assumes financial responsibility for the insureds' medical claims or contracts with a health insurance company who assumes financial responsibility for the insureds' medical claims.  These plans are governed by ERISA.

34.     Private insurance plans are plans which individual patients contract with a health insurance company who assumes financial responsibility for the insureds' medical claims on an individual basis. These plans are governed by Texas state law.

35.     For purposes of completeness, another category of insurance policies exist in which individuals are insured under the Federal Employees Health Benefits Act.  This lawsuit does not concern any patients covered by FEHBA plans.

36.     Despite the differences in the categories of the insurance policies above, all of the claims at issue in this lawsuit were administered by the Defendant and were not paid or reimbursed at the usual and customary rates for the same or similar medical services in and around Fort Bend and surrounding counties as required by the plan documents.

### ERISA BASED VIOLATIONS

37.     The ERISA based causes of actions described within this section arise from the ERISA health benefits plan described above.

38.     29 U.S.C. § 1002(8) defines "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."   As assignees of the ERISA insured members Plaintiff is the beneficiary for all purposes throughout this Complaint.

39.     29 U.S.C. § 1002(21)(A)(iii)  determines that one is a "fiduciary" to the extent that the person "has any discretionary authority or discretionary responsibility in the administration" of a health benefits plan. As described above, Defendant functioned as fiduciaries with respect to the plans at issue in this case because Defendant exercised discretion, authority, and control in determining whether and to what extent benefits would be paid to Plaintiff.  Therefore, Defendant is a fiduciary to Plaintiff.

40.     29 U.S.C. § 1002(3) defines "employee benefit plan," in part, as an employee welfare benefit plan. 29 U.S.C. § 1002(1) defines "employee welfare benefit plan" as follows:

> [A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise,
>> (A)     medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation

benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or

(B)     any benefit described in section 186 (c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

Defendant is considered the employee benefit plan for each of the ERISA claims identified herein.

## COUNT 1: PROVIDERS' CLAIMS UNDER 29 U.S.C. § 1132(a)(1)(B)

41.     The allegations contained in Paragraphs 1 through 40 are re-alleged and incorporated herein as if set forth verbatim.

42.     Plaintiff brings this action as a beneficiary to recover benefits under ERISA health benefit plans. Under 29 U.S.C. § 1132(a)(1)(B), Plaintiff is entitled to recover benefits for providing medical services to patients from whom Plaintiff received an Assignment of Benefits.

43.     The health benefit plans mandate reimbursement of reasonable and necessary medical expenses in accordance with the "Allowable Amount," typically defined as usual and customary or usual, customary, and reasonable. On information and belief, the same coverage and payment provisions are utilized across different health plans.

44.     A representative example of plan terms for the claims at issue in this lawsuit and which illustrates Defendant's obligation to pay based usual and customary rates is the following:

A reasonable and customary charge is the usual cost for comparable treatment in a local geographic area. Charges for non-network doctors' fees covered under the plan are subject to reasonable and customary reimbursement limits. The reasonable and customary reimbursement level is set at the 80th percentile of charges in a geographic area.

One of the patients whose plan used the language identified here is identified as patient number 483 on Exhibit A. Plaintiff followed its usual procedure described more particularly above in obtaining an assignment of benefits, obtaining pre-approval from Defendant, and performing the procedure. Plaintiff billed its usual and customary rate in line with the above-identified definition, which was $16,020.00. The claim was properly and timely presented to Defendant and Defendant

paid a mere $1,156.23, which amounts to roughly 7% of the charges. This payment was substantially below Plaintiff's usual and customary charge, and was in no way in line with "charges made for the same service by providers in the same geographic area with similar training, experience and facilities," which is synonymous or nearly synonymous with the terms "usual and customary" as defined by the American Medical Association and United States government and relied upon by medical providers and other actors within the healthcare field.

45.     Another representative example of similar language from a health benefits plan at issue in the case is as follows:

> The Allowable Amount will be the lesser of the billed charge or the amount BCBSTX would have considered for payment for the same covered procedure, service or supply if performed or provided by a Physician or professional Other Provider with Similar experience and/ or skill.

One of the patients whose plan used the language identified here is identified as patient number 168 on Exhibit A. Plaintiff again followed the usual procedure described more particularly above in obtaining an assignment of benefits, obtaining pre-approval from Defendant, and performing the procedure. Plaintiff billed its usual and customary rate in line with the above-identified definition, which was $57,362.00. The claim was properly and timely presented to Defendant and Defendant paid a mere $1,530.98, which amounts to a paltry 3% of the charges. This payment was substantially below Plaintiff's usual and customary charge. Furthermore, the payment was markedly below "prevailing charges in [the] geographic area," which is, yet again, synonymous or nearly synonymous with the terms "usual and customary" as defined by the American Medical Association and United States government and relied upon by medical providers and other actors within the healthcare field.

46.     A third representative example of similar plan language at issues in this case is the following:

> The maximum amount that will be allowed by [the plan] for a medical service or supply. Allowable amount is determined by BCBSTX based on either charges made for the same service by providers in the same geographic area with similar training, experience, and facilities, or negotiated rates with providers who have contracted with BCBSTX[… ]

One of the patients whose plan used the language identified here is identified as patient number 33 on Exhibit A. Plaintiff followed its usual procedure described more particularly above in obtaining an assignment of benefits, obtaining pre-approval from Defendant, and performing the procedure. Plaintiff billed its usual and customary rate in line with the above-identified definition, which was $12,976.00. The claim was properly and timely presented to Defendant and Defendant paid a mere $223.49, which amounts to only 1.72% of the charges. This payment was substantially below Plaintiff's usual and customary charge. Furthermore, the payment was significantly below charges for "the same service by providers in the same geographic area with similar training, experience, and facilities," which is, once again, synonymous or nearly synonymous with the terms "usual and customary" as defined by the American Medical Association and United States government and relied upon by medical providers and other actors within the healthcare field.

47.     Language of this type is standard across the industry and is typical of health plans issued by Defendant. This point is well illustrated by a number of lawsuits filed in jurisdictions across the country against Defendant and its affiliates with allegations similar to those made herein. In *Innova*, the plaintiff identified plan language that required payment of 80% of reasonable and customary expenses. *See Innova Hosp. San Antonio, L.P. v. Blue Cross and Blue Shield of Ga., Inc.*, No. 3:12-cv-1607 (N.D. Tex. July 21, 2014). In that case, a charge was defined as reasonable when the fee for a specific service or supply falls within the range of usual charges in the same geographical area, and "customary" when the fee is that which is most frequently charges for a similar medical service, procedure, or supply. *Id.* In *In re Wellpoint, Inc.*, the Central District of California wrote, "[Insurer] allegedly promises to reimburse subscribers for [out-of-network]

services obtained from out-of-network providers at a percentage of the lesser of either (1) the actual amount of the subscribers' medical bills or (2) the UCR rate charged by providers "in the same or similar geographic area" for "substantially the same service." *See In re WellPoint, Inc. Out-of-Network "UCR Rates" Litigation*, 865 F.Supp.2d 1002 (C.D. Cal. 2011). In *Wade v. WellPoint, Inc.*, the Court wrote that "When WellPoint members seek medical services from out-of-network, the Company reimburses them for these services 'by paying the lesser of the billed charge or the 'usual and customary rate' (UCR) of doctors in the same or similar geographic area for substantially the same service." *See Wade v. WellPoint, Inc.*, 892 F.Supp.2d 1102 (S.D. Ind. 2012). The consistency of plan language across the plans at issue in this case and in the global arena of litigation against BlueCross and BlueShield related entities is undeniable.

48.     Defendant here breached the plan documents by failing to pay Plaintiff in accordance with the operative plan terms. Defendant instead paid claims based upon arbitrary and undisclosed fee schedules and methodologies that did not comply with the health benefits plan. Plaintiff billed the usual and customary rates for its geographical area for medical services rendered, in line with the plan documents and applicable plan terms, and Defendant administered the claims resulting in drastic underpayments in the amount of $11,025,367.60, inclusive of the State law claims.

## COUNT 2: FAILURE TO PROVIDE REQUESTED INFORMATION

49.     The allegations contained in Paragraphs 1 through 48 are re-alleged and incorporated herein as if set forth verbatim.

50.     29 U.S.C. § 1132(c) provides penalties for an administrator's refusal to supply required information.  29 U.S.C. § 1132(c)(1)(B) provides:

> Any administrator who fails or refuses to comply with a request for
> any information which such administrator is required by this

subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

51.     Defendant failed to comply with its obligations to respond to and provide requested information to Plaintiff. Plaintiff requested, in writing and on multiple occasions, copies of documents related to the claims and plans at issue in this case. Plaintiff made these requests, in writing and with documentation and information supporting the requests, to Defendant on July 24, 2014 and October 1, 2014. The information and documentation consisted of spreadsheets identifying the claims and relevant claim information and assignments of benefits for the patients at issue. The assignments of benefits made clear that Grand Parkway was the assignee of the health benefits plans and that Grand Parkway and Grand Parkway's attorneys had full authority to make the demand and collect the insurance benefits to which it was entitled. The claims information identified the claims, dates of procedures, and the billed charges, in addition to other material claim information. Every claim listed within Exhibit A was included within the two demands of July 24, 2014 and October 1, 2014.

52.     Furthermore, 29 U.S.C. § 1024(b)(4) states, in part, "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, or other instruments under which the plan is established or operated." No such

documents were ever produced to Plaintiff despite the repeated requests made by Plaintiff and its attorneys.

53.     Moreover, pursuant to 29 C.F.R. 2560.503-1(h)(2),   was required, among other things, to do the following:

> (ii)     Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

> (iii)    Provide that a claimant be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits;

54.     Defendant wholly failed to fulfill their obligations under ERISA by failing to comply with its obligations as plan administrator to supply required information. Despite demands for all documents, records, and other information relevant to Plaintiff's claim for benefits as described above, Defendant produced nothing to Plaintiff.

55.     Defendant acted as plan administrator and/or was designated as plan administrator by each of the ERISA plans at issue in this case. Despite its clear obligations under the plans and ERISA, Defendant wholly failed to provide any plan documents to Plaintiff despite repeated requests by Plaintiff.

56.     The acts and omissions on the part of Defendant in failing to comply with the request for information pursuant to 29 U.S.C. § 1132(c)(1)(B) and in violation of 29 C.F.R. 2560.503-1(h), make Defendant liable for a civil penalty/sanction in the amount of $100 per day for such failure and refusal to provide the requested documents.  As such, Plaintiff is not only entitled to the requested documents through an appropriate order of this Court but they are also entitled to the $100 per day civil penalty for each claim at issue in this case.

## COUNT 3: FAILURE TO PROVIDE FULL AND FAIR REVIEW

57.     The allegations contained in Paragraphs 1 through 56 are re-alleged and incorporated herein as if set forth verbatim.

58.     29 U.S.C. § 1133 and its regulations mandate that Defendant provide a "full and fair review" and make certain disclosures.   Defendant wholly failed to comply with these requirements.

59.     29 U.S.C. § 1133 states:

> In accordance with regulations of the Secretary every employee benefit plan shall (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied a full and fair review by the appropriate named fiduciary of the decision denying the claim.

60.     Defendant failed to provide the specific reasons for its denials of benefits and the denials were not written in a manner calculated to be understood by the participant. Specifically, the denial letters from Defendant either gave no explanation as to why the claim was denied or underpaid, gave an explanation that was conclusory in nature and/or made no attempt to explain any rational basis for the denials or underpayments.

61.     Moreover, pursuant to 29 C.F.R. 2560.503-1(h)(2), Defendant was required, among other things, to do the following:

> (iv)    Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

Defendant's review fails to take into account all comments, documents, records, and other information submitted by Plaintiff.   When Plaintiff appealed these determinations, Defendant

rarely amended its initial determination that denied or substantially underpaid the benefits owed under the plan. Defendant either provided no explanations for its adverse determination against Plaintiff or provided conclusory explanations that frequently consisted of one to two sentences that read that Defendant was "maintain[ing] the prior decision" or that the "claim processed correctly."

62.     Plaintiff was proximately harmed by Defendant's failure to comply with 29 U.S.C. § 1133. Defendant's failure affected all claims within Exhibit A. The Court is free to fashion whatever remedy it deems appropriate for a violation of this provision of ERISA. At a minimum, the Court should award the statutory penalty referenced above in paragraph 56 and remand to the plan administrator below for the full and fair review mandated by ERISA.

## COUNT 4: BREACH OF FIDUCIARY DUTY

63.     The allegations contained in Paragraphs 1 through 62 are re-alleged and incorporated herein as if set forth verbatim.

64.     29 U.S.C. § 1132(a)(3) states that a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

65.     Plaintiff, as the assignee of ERISA members and beneficiaries under the insurance plans, are entitled to assert a claim for relief for Defendant's breach of fiduciary duties of loyalty and care and for failure to follow plan documents under 29 U.S.C. § 1104(a)(1)(B) and (D). Defendant acted as fiduciaries to Plaintiff and/or to patients who made assignments of benefits to Plaintiff. Defendant exercised discretion, control, authority and oversight in determining whether plan benefits would be paid and the amounts of plan benefits that would be paid.

66.     Furthermore, during the entire time that Defendant administered the plans and claims at issue in this case, it operated under a conflict of interest. Defendant entered into agreements with employers and plan sponsors that incentivized Defendant's denial and underpayment of claims. Frequently referred to as "savings," the agreements between Defendant and employers actually allowed Defendant to financially benefit when the dollar value of claims paid out either decreased or fell below certain targets. This created the perverse arrangement whereby the person with discretionary authority to determine the validity of a claim and the amount of reimbursement for a claim would stand to benefit financially by denying the claim or underpaying the claim. This arrangement existed despite the fact that Defendant was actually acting in the role of a fiduciary.

67.     29 U.S.C. § 1104(a)(1)(B), (D) provides for the prudent man standard of care stating:

> Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
>> (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;
>> (B) with the care skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>> (C) omitted; and
>> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

68.     Moreover, Defendant breached the fiduciary duties identified above by not paying or drastically underpaying claims and administering the claims while operating under a clear conflict of interest.  Additionally, the administration of the claims by Defendant subsequent to

procedures performed by Plaintiff conflicted with the representations made by Defendant's representatives during the verification process. The determinations of the benefits to be paid were made to the benefit of Defendant and to the detriment of Plaintiff.

69.     By engaging in the conduct described above, Defendant failed to act with the care, skill, prudence, and diligence under the circumstances that a prudent plan administrator would use in the conduct of an enterprise of like character.   The conduct demonstrated throughout this Complaint establishes Defendant's failure to exercise reasonable care toward Plaintiff. This conduct resulted in an underpayment to Plaintiff of $11,025,367.60, inclusive of the State law claims, and impaired Plaintiff's continued operation and treatment of its patients. Plaintiff's operations and treatment of its patients remain in peril due to Defendant's actions.

## STATE LAW CLAIMS

## COUNT 4: BREACH OF CONTRACT

70.     The allegations contained in Paragraphs 1 through 69 are re-alleged and incorporated herein as if set forth verbatim.

71.     With respect to the private individual health benefit plans, patients fulfilled their obligations by paying premiums for out of network health insurance benefits.

72.     Plaintiff brings this action to recover benefits under the patients' individual health benefit plans for providing reasonable and necessary medical services to patients and from whom Plaintiff received an Assignment of Benefits.

73.     The health benefit plans mandate reimbursement of reasonable and necessary medical expenses in accordance with the "Allowable Amount," typically defined as usual and customary or usual, customary, and reasonable. The operative plan terms for the private plans for which this cause of action applies are in no way different than the operative plan terms for the

ERISA plans identified above. The applicable plan terms and Defendant's breach of the same are more particularly described in paragraphs 11-13 and 41-48, and those paragraphs are incorporated herein by reference.

74.     Plaintiff billed its usual and customary rates for the same or similar medical services rendered and Defendant administered the claims resulting in drastic underpayments in the amount of $11,025,367.60 inclusive of the ERISA claims, thereby breaching the patients' health benefits plan.

75.     Without the benefit of discovery, it is impossible for Plaintiff to identify which plans are ERISA plans and which plans are private plans. Furthermore, aside from any jurisdictional issues that would present based upon the application of federal law versus state law, there is simply no difference between the two causes of action for purposes of the pleadings. The reality is that regardless of whether the plan is a private plan or ERISA plan, the plan language is the same. The operative plan term that defines the Defendant's obligation to pay and upon which this lawsuit is based are identical. Moreover, Defendant administers the private plans and the ERISA plans in the same manner.

### COUNT 5: PROMISSORY ESTOPPEL

76.     The allegations contained in Paragraphs 1 through 75 are re-alleged and incorporated herein as if set forth verbatim.

77.     During the verification phone conferences between Plaintiff and Defendant, Defendant represented to Plaintiff that the patients and services were covered by health insurance policies that contained out-of-network benefits. Moreover, as more particularly described above, it is industry custom in the healthcare and medical insurance industries that reimbursement for out-of-network services are based upon usual and customary. This is so well-known amongst medical

providers and commercial health insurance carriers that it is presumed that this level of reimbursement will apply. Defendant, having a duty to alert Plaintiff if the operative plan language differed from industry custom, never indicated to Plaintiff that any level of reimbursement other than usual and customary was applicable. Therefore, Plaintiff reasonably proceeded with the understanding that reimbursement would be made at its usual and customary rates.

78.     The usual and customary rate is understood by medical providers and commercial insurance companies generally and was understood by Plaintiff and Defendant in the specific instances of this case, to mean the "Usual, Customary, and Reasonable" rate as defined by the American Medical Association and United States government, and in line with the "Allowable Amount" definitions in the plan documents.

79.     Plaintiff reasonably and substantially relied on the verifications from Defendant by performing medical services. Undoubtedly, Plaintiff would never have performed the medical services without verification from Defendants that the patients and services would be covered at the usual and customary rate.

80.     Furthermore, Plaintiff's reliance on Defendant's promises was foreseeable by Defendant. The entire purpose of Plaintiff's verification confirmation calls was to obtain assurance that the patient and the medical services were covered.  Defendant, who is in the business of administering health insurance policies, understood this fact and knew or should have known that Plaintiff would perform medical services after Defendant's verification of coverages and assurance of payments, and understood that Plaintiff reasonably expected verification at its usual and customary rate.

81.     Defendant failed to pay and underpaid Plaintiff's claims causing drastic underpayments in the amount of $11,025,367.60, inclusive of the ERISA claims.

## DAMAGES

82.     The allegations contained in Paragraphs 1 through 81 are re-alleged and incorporated herein as if set forth verbatim.

83.     Plaintiff is entitled to actual damages in the amount of at least $11,025,367.60.

84.     In addition, the acts and omissions on the part of Defendant in failing to comply with the request for information pursuant to 29 U.S.C. § 1132(c)(1)(B) and in violation of 29 C.F.R. 2560.503-1(h), makes Defendant liable for a civil penalty/sanction in the amount of $100 per day for such failure and refusal to provide the requested documents.

85.     Plaintiff is entitled to an award of attorneys' fees on its ERISA claims.  *See* 29 U.S.C. § 1132(g)(1) (allowing a court, in its discretion to award "a reasonable attorney's fee and costs of action to either party."); *See also Hardt v. Reliance Std. Life Ins. Co.*, 130 S. Ct. 2149, 2152 (2010).

86.     Plaintiff is also entitled to an award of attorneys' fees on their state law claims. Plaintiff has presented claims to Defendant, along with an Assignment of Benefits, demanding payment for the value of the services described above.  Defendant failed and refused to pay Plaintiff more than 30 days after the demands were made pursuant to the Texas Civil Practices and Remedies Code section 38.001.  As a result of Defendant's failure to pay these claims, Plaintiff was required to retain legal counsel to institute and prosecute this action.

**CONCLUSION**

87.     Plaintiff prays for the following relief: judgment for actual damages; statutory penalties; attorneys' fees; pre- and post-judgment interest; costs of suit; and any other relief to which Plaintiff may be justly entitled.

Respectfully submitted,

Bergquist Law Firm

By: /s/ David W. Bergquist                                
David W. Bergquist
Southern District of Texas No. 37790
Texas State Bar No. 24040512
55 Waugh Drive, Suite 400
Houston, Texas 77007
Tel. (713) 655-8000
Fax (713) 739-0000
Email: dwb@bergquistlawfirm.com
Attorney for Plaintiff
GRAND PARKWAY SURGICAL CENTER, LLC